UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SUZANNE WRIGHT, Individually and as
Trustee of THE WENSLEY HEFNI 2011
IRREVOCABLE TRUST,

               Plaintiff,

   vs.

SILVER CREEK PHARMACEUTICALS,
INC., NICK TAYLOR, TIMOTHY
THROSBY, MARK AGNE, JAMES
MARKS and THOMAS MURTAUGH,

           Defendants

Civ. A. No.

## COMPLAINT AND JURY DEMAND

Plaintiff Suzanne Wright, individually and as trustee of The Wensley Hefni 2011 Irrevocable Trust ( "Ms. Wright," the "Hefni Trust" or "Plaintiffs") alleges the following against Defendants Silver Creek Pharmaceuticals, Inc. ("Silver Creek" or the "Company"), Nick Taylor ("Mr. Taylor"), Timothy Throsby ("Mr. Throsby"), Mark Agne ("Mr. Agne"), James Marks ("Mr. Marks") and Thomas Murtaugh ("Mr. Murtaugh") (collectively, "Defendants"):

## PARTIES

1.     Ms. Wright resides in Beverly, Massachusetts.

2.     Ms. Wright is the trustee of the Hefni Trust. References in this Complaint to "Ms. Wright" are, when applicable, meant to refer both to her individual capacity and her capacity as trustee of the Hefni Trust. At all times relevant to this Complaint, Ms. Wright was acting as an Accredited Investor pursuant to 17 CFR § 230.501(a)(5).

3.     Silver Creek is a Delaware corporation with its principal place of business in San Francisco, California. Silver Creek is a private biotechnology corporation that develops and manufactures "Smart Growth Factor" medicines designed to promote tissue regeneration—specifically, to repair damaged tissue from acute heart attack, stroke, acute kidney injury, and traumatic brain injury.  Silver Creek was founded in 2010.

4.     Mr. Taylor resides in Hong Kong.

5.     Mr. Throsby resides in the United Kingdom.

6.     Mr. Agne resides in the United Kingdom.

7.     Mr. Marks resides in San Francisco, CA.

8.     Mr. Murtaugh resides in Boston, MA.

## JURISDICTION AND VENUE

9.     The claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933 arise under the law of the United States, as appears more fully below. The Court has jurisdiction under 28 U.S.C. § 1331.

10.     The Court has jurisdiction of the claim under the Securities Exchange Act of 1934 under Section 27(a) of the Act, 15 U.S.C. § 78aa.

11.     The Court has jurisdiction of the claim under the Securities Act of 1930 under Section 22 of the Act, 15 U.S.C. § 77v.

12.     The claims arising under state law are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. The Court has jurisdiction under 28 U.S.C. § 1367(a).

## FACTS

***Defendants Solicit Ms. Wright Multiple Times to Induce Her to Invest, And She is an Early Supporter of the Company***

13.     Silver Creek is a biotechnology company focused on developing the therapeutic potential of growth factors in a new class of biological molecules to treat acute organ injuries.

14.     At all relevant times, Mr. Throsby, Mr. Agne and Mr. Taylor held ownership interests in and were on the Board of Directors of Silver Creek (hereinafter, the "Board"); Mr. Throsby was and is the Board chairman. At all relevant times, Mr. Marks and Mr. Murtaugh were members of the Board of Directors.

15.     Starting in approximately 2010, Silver Creek sought funding from outsiders in order to develop its business. In its initial fundraising round in 2010, the Company offered Series A Preferred Stock in Silver Creek to investors.

16.     The Company held a second fundraising round in 2015, this time offering Series B Preferred Stock in Silver Creek.

17.     Included among investors that the Company (including its insiders) targeted during this 2015 fundraising round was Ms. Wright.

18.     During Silver Creek's 2015 fundraising round, Ms. Wright individually purchased 222,222 shares of Series B Preferred Stock, and the Hefni Trust purchased 370,370 shares of Series B Preferred Stock.

19.     In 2016, Silver Creek began a third fundraising round, offering investors convertible promissory notes that were convertible into Series C Preferred Stock in the Company.

20.     During Silver Creek's 2016 fundraising round, Ms. Wright purchased convertible promissory notes that in late 2016 were converted into 137,519 shares of Series C Preferred Stock.

21.     In 2020, Silver Creek held another fundraising round for Series D Preferred Stock (hereinafter, the "D Round").

22.     During Silver Creek's 2020 D Round, Ms. Wright purchased 8,333 shares of Series D Preferred Stock. The purchase price in the Series D round was $6 per share.

23.     All told, Ms. Wright and the Hefni Trust are significant owners and investors in Silver Creek. Ms. Wright individually is the record owner of 222,222 shares of Series B Preferred Stock of Silver Creek, 137,519 shares of Series C Preferred Stock, and 8,333 shares of Series D Preferred Stock. The Hefni Trust is the record owner of 370,370 shares of Series B Preferred Stock of Silver Creek.

24.     In connection with their respective ownership interests set forth above, Ms. Wright and the Hefni Trust are party to three stock purchase agreements with Silver Creek.

25.     In connection with the D Round in 2020, Ms. Wright also executed an Amended and Restated Investor's Rights Agreement for Series D Preferred Stock (the "IRA").

26.     Section 2.4 of the IRA contains a "right of first offer," entitling Major Investors and their affiliates (which includes Ms. Wright and the Hefni Trust) to participate in "future sales by the Company of its Shares."

27.     The IRA's "right of first offer" entitled Ms. Wright to participate in "future sales by the Company of its Shares," which term includes shares of capital stock and securities convertible into capital stock of the Company. The purpose of this provision was to provide Ms. Wright with a meaningful and informed opportunity to participate in all future securities

offerings by Silver Creek, as well as with protection against subsequent dilution of Ms. Wright's holdings in the Company.

28.     This right of first offer provision in Section 2.4 of the IRA also included express investor notice provisions about a qualifying subsequent offering, intended to assure that Ms. Wright was on full, fair and complete notice of any such opportunity, at the time it became available to her. These contractual notice provisions were distinct from the disclosure requirements imposed on the Company by federal and state securities laws, including but not limited to 17 C.F.R. § 240.10b-5, that would apply to any subsequent offering of securities made by the Company.

***Mr. Throsby and Mr. Taylor Set a Goal to Expand Silver Creek into New Markets - and Intentionally Withhold Their Plan From Ms. Wright (While Investing Themselves at Low Valuation)***

29.     During the period of time in which the Plaintiffs made their investments in Silver Creek, the Company employed Michael Fairbanks ("Mr. Fairbanks") as its full-time chief executive officer ("CEO").

30.     On or about December 31, 2020, Mr. Fairbanks resigned from his position as CEO of Silver Creek. The Company has operated without a CEO since then.

31.     Shortly following Mr. Fairbanks's departure, the Company took down its website and began to significantly reduce the information it disclosed to Silver Creek stockholders.

32.     By 2021, the Company's strategic decisions and operations were being directed and controlled by the stockholder-Board members Mr. Throsby and Mr. Taylor.

33.     In or about December 2021, the Company (through Mr. Throsby and Mr. Taylor) announced to Silver Creek shareholders that in 2022 they would seek to raise additional capital

from investors through the sale of unsecured notes convertible into Silver Creek capital stock (hereinafter, the "CB Round.")

34.     The Company offered the CB Round to existing shareholders of Silver Creek, as well as to new investors.

35.     The notes to be issued in the CB Round did not specify the price per share at which the notes could be converted to stock. However, the company set lower and upper limits on the valuation, a floor and a ceiling. The floor was $6, and the ceiling was $12. The company communicated the floor and the ceiling to Ms. Wright in writing, as alleged further below.

36.     The valuation range used in the CB Round did not reflect the Company's recent successes, which had occurred between the end of the D Round in 2020 and the beginning of the CB Round in late 2021. During that period, Silver Creek had completed a successful Phase 1 clinical trial, and it had disclosed to Shareholders that it had discovered that its intellectual property had many more applications, and therefore markets, than it initially believed.

37.     Not only did the CB Round's valuation range not reflect these recent achievements by the Company that Shareholders and potential investors were aware of, it also failed to reflect certain, highly-significant advancements that Silver Creek had made with its intellectual property that were known to the Board, but *not* disclosed to other shareholders or prospective investors.

38.     On information and belief, Mr. Marks and Mr. Murtaugh were aware of - and either approved or ratified - all of Mr. Throsby, Mr. Agne and Mr. Taylor's actions in connection with the CB Round.

39.     On information and belief, the undisclosed purpose of CB Round fundraising effort was to develop the Company's expansion into new markets for the Company's intellectual

6

property. This included pursuing non-dilutive government funding for expanding into radiation illness as an application and focus of the company's efforts.

40.     On information and belief, Mr. Throsby, Mr. Taylor (through an intermediary), and Mr. Agne had a personal interest in the CB Round fundraising effort: they intended to invest in the Company but at a lower price than they would have had to pay had they marketed the shares offered to investors using an accurate valuation range, and to deter others (including Ms. Wright) from participating in the investment opportunity in order to maximize value for themselves.

41.     On information and belief, the other members of the Board at this time, Mr. Marks and Mr. Murtaugh, were aware of and either approved or ratified Mr. Throsby, Mr. Taylor, and Mr. Agne's plan.

42.     On December 23, 2021, Mr. Throsby first informed Ms. Wright about the CB Round investment opportunity by email with the subject line "end of year update." A copy of an email thread beginning with Mr. Throsby's December 23, 2021 email is attached as **Exhibit A**.

43.     Mr. Throsby did not describe or characterize his December 23, 2021 email as a formal notice to shareholders.  The email did not comply with the express right of first offer provisions in the IRA, and it did not reference a waiver or amendment of any required notice provisions. *See* **Ex. A**.

44.     On December 30, 2021, Ms. Wright wrote to the only employee of Silver Creek whose contact information was readily available to Silver Creek investors at the time, an administrative assistant. Ms. Wright inquired:

> This is Suzanne Wright, one of the Silvercreek investors. I have a few questions but am not sure where to direct them as there does not seem to be a CEO for the company. Do you know if that is something that is in the works? What I am concerned about is the apparently low valuation for the

next round of fund-raising given the significant progress that appears to have been made since the last round. Is there someone to whom I can direct that question? And is there any way to find out if there is currently a CEO search underway?

*See* **Ex. A**.

45.     On January 7, 2022, Mr. Throsby responded to Ms. Wright's inquiry and offered to schedule a call with himself, Mr. Taylor and Ms. Wright to discuss her email. As to the valuation of the Company with respect to the upcoming CB Round, Mr. Throsby stated:

> The board has tried to structure and price the new fund raising in a way that gives appropriate recognition of the progress made in 2021, and at the same time recognises the stage of development we are at, and of course as in all Biotech, the risk ahead - $500 mill USD market cap (at top end of range of the issue) is a strong indication of the platform the team have developed - however, we also made the deliberate step, for the first time at Silver Creek, of allowing every shareholder to participate in the round pro rata to their current shareholding - ensuring no shareholder will be diluted unnecessarily.

A copy of an email chain beginning with Mr. Throsby's January 7, 2022 email is attached as

**Exhibit B**.

46.     On January 17, 2022, Ms. Wright replied to Mr. Throsby stating:

> Thank you for responding to the email I sent to Silver Creek at the end of last year.  Upon receiving Silver Creek's update, I have a LOT of questions, particularly about the company's management and the valuation of the next round. I prefer to put down my questions, and receive the answers, in writing. I need a day or two to review my shareholder rights to documentation. Without documentation and further explanation about the leadership structure of the company, as well as how the valuation was arrived upon (as well as normal information such as burn rate, money in the bank etc), I feel like I do not have nearly enough information to determine whether a further investment in Silver Creek is advisable. I have to say, I have found the shareholder communication during this last year extremely sparse and incomplete.
>
> I am both a business owner and an attorney and so I need a few more days to find time to do a thorough review of my shareholder rights as included in earlier documentation. Once I have time to do that, I will send more specific

requests and questions in writing to ensure all fiduciary duties to shareholders are being met.

*See* **Ex. B**.

47.    On January 18, 2022, Mr. Throsby emailed Ms. Wright, stating in part:

> You are of course free to refresh your understanding of the shareholder rights, but we do not believe it is necessary as we are happy to discuss the current and future operations of the firm in a high level of detail, and have always been willing to do the same with any shareholder that has had questions. Most investors have found our updates in 2021 extremely detailed and transparent, but we are happy to try and address additional questions that you might find useful or outstanding. The board has tried to make its communications more descriptive, more thorough, but perhaps less frequent.
>
>                                        * * *
>
> To structure the round the board members have engaged with a number of investment banks, and examined many comparable enterprises and their development stage and valuation - the proposed upper valuation of $12 per share or approximately $500 million market cap is appropriate for our stage of development, in fact some might say ambitious for such a stage - we decided a similar reset protection to the round D would be appropriate, hence the floor valuation of $6 per share or approx $250 million - additionally the ability of all current investors to participate in the round ensures no undesired dilution of anyones[sic] holdings - we would point out that the $12 represents a doubling of the round D maximum price, and and[sic] 800% uplift since round C in 2017.

A copy of an email chain beginning with Mr. Throsby's January 18, 2022 email is attached as

**Exhibit C**.

48.    On January 31, 2022, Ms. Wright wrote to Mr. Throsby requesting additional

information about the Company in order to determine whether or not to participate in the CB

Round proposal:

> Regarding the valuation for the next financing round, it has been my experience that, when significant business and scientific gains/milestones have been met, there is an equivalent jump in valuation which is then reflected in the pricing of the next round of financing. As a stockholder, I don't feel like I have adequate information regarding the reasoning behind the valuation of the next round. If the scientific gains are as substantial as indicated, I would have thought valuation would have gone up considerably.

A lower valuation helps insiders gain more shares of the company at an attractive price but does not really treat all shareholders fairly. Shareholders who do not have substantial information on the assumptions that have gone into the valuation, including an in-depth understanding of current financial issues, such as the rate of cash burn, the assumptions regarding cash needed to meet next milestones, the timing and valuation of meeting future milestones, the potential exit strategy for shareholders etc., are not adequately armed with the right information on which to determine whether to buy into the next round. *Therefore, while we are ostensibly being provided a chance not to be diluted in this next round, we lack the information to make a rational decision on whether to buy more shares*. For this reason, I would like to be provided with all of the information summarized above. I would also like a copy of the current cap table.

* * *

To summarize, I would very much like to see the current cap table and be provided with more detailed information on the current finances of the company (including burn rate, assumptions of capital needed to reach next milestones, timing and assumed valuation of meeting milestones, and also much more detail regarding the assumptions that went into the pricing of the next round of financing.). I would also like to know if there is any plan at all to eventually hire a CEO with the right kind of business experience, particularly with startup bio med companies.

Thank you for your help. *Without this information, I do not believe I am in a position to make an informed decision on whether to buy more shares and thereby prevent dilution of my existing position*.

*See* **Ex. C**. (Emphasis added.)

49.     Mr. Throsby responded to Ms. Wright's January 31, 2022 email with an offer to have a conference call to discuss her concerns. Ms. Wright replied on the same date, stating that she preferred to communicate with the Company in writing: "I would like to receive the information I have requested in an email or other written form." *See* **Ex. C**.

50.     The Company proceeded with the CB Round fundraising effort without providing Ms. Wright with the information she requested from Mr. Throsby.

51.     Furthermore, unknown to Ms. Wright and many other shareholders, throughout 2021 and into January of 2022, Mr. Throsby, Mr. Taylor and Mr. Agne (with the knowledge

and/or ratification of Mr. Marks and Mr. Murtaugh) possessed material, undisclosed details about the CB Round, and the Company had already begun accepting millions of dollars from new investors towards it.

52.     By January 31, 2022, Silver Creek had raised over $9 million dollars during the CB Round, and Mr. Throsby, Mr. Taylor and Mr. Agne all participated in the investment opportunity. *See* **Exhibit D** (Silver Creek Form D filed with SEC on February 14, 2022). These funds were raised before the Company had informed the Shareholders- even informally- of their plan to hold the CB Round.

53.     Rather than provide Ms. Wright with the details and the information she had on multiple occasions requested in writing regarding the CB Round, defendants instead, as part of their scheme (and only a matter of days after their "Form D" filing with the SEC), organized a "zoom" call on February 17, 2022 with shareholders of Silver Creek. A copy of the February 10, 2022 email notifying shareholders of this "zoom" call is attached as **Exhibit E**.

54.     In advance of the "zoom" call, the Defendants' February 10, 2022 email stated that they "will be updating you all on the development of the company, scientific and medical progress, our financial planning, and our strategy and goals for the company and its assets. The information packet and the video calls will also ensure all investors have the most up to date and comprehensive information when making decisions on participation in the current fund raising round." Ms. Wright reasonably relied on this being an accurate, complete, and truthful statement. *See* **Ex. E**.

55.     The February 10, 2022 email was not described or characterized as a notice, and did not comply with the right of first offer provisions in the IRA. *See* **Ex. E**.

56.     Ms. Wright was invited to and did participate on the February 17, 2022 "zoom" call.

57.     In advance of and on the February 17, 2022 "zoom" call, and in connection with the CB Round proposal, Defendants individually and collectively had a duty to disclose material information about the Company in connection with the offering.

58.     They did not. *At no point* in any disclosures made to shareholders or potential investors prior to or during the CB Round did Mr. Throsby, Mr. Agne or Mr. Taylor (or any of the other Board members), or the Company, *ever* tell Ms. Wright about their plan to expand Silver Creek's business, and particularly into radiation illness. This was a huge opportunity for the Company, which was even more likely to be lucrative given the war in Ukraine and the resultant, highly reported-upon risk of radiation events occurring in the world. And the omission was misleading, because the Board members *did* disclose potential expansion into other new areas, including cosmetic applications, in the February update.

59.     During the February 17, 2022 meeting, no director or member of management mentioned that Silver Creek had identified or conducted lengthy and costly research into the Silver Creek molecule to treat radiation illness.

60.     On information and belief, this nondisclosure was intentional, in order for Defendants to benefit personally at the expense of Ms. Wright.

61.     Furthermore, prior to the June 30, 2022 close of the CB Round, Silver Creek had conducted preclinical trials and thus had knowledge that its IP had shown extremely promising results in reducing the mortality caused by radiation illness. Silver Creek did not disclose to Ms. Wright these highly-favorable results in preclinical testing for radiation illness prior to the end of the CB Round.

62.     The CB Round ultimately closed on June 30, 2022, at an improperly-low valuation, presumably with Board approval.

63.     Given the absence of full and complete material disclosures by the Company, as well as the Company's refusal to provide the information that Ms. Wright requested, Ms. Wright did not invest. The Board's nondisclosure of the Company's recent successful clinical results was intentional, and designed to obscure the dramatic increase in the value of Silver Creek. Moreover, the failure to disclose these positive test results of Silver Creek IP in the area of radiation illness also enabled Defendants to argue that their CB Round valuation range was reasonable.

64.     However, knowing the Company's true plans, Mr. Throsby, Mr. Taylor and Mr. Agne **did** invest in Silver Creek during the CB Round, at an improperly low valuation, for their own unfair personal gain, thereby enriching themselves while diluting Ms. Wright's interests and investments in the Company in violation of the IRA.

***Ms. Wright Discovers Key Omissions Which Have Significantly Diminished the Value of Her Investment In Silver Creek***

65.     At the end of the summer, on August 18, 2022, Silver Creek (from its general "info@silvercreekpharma.com" account) provided a further update in a letter sent to all investors. This communication confirmed that the Company's then-current directors accounted for 21% of the CB Round and the Company added 19 new investors (accounting for 57% of the CB Round), resulting in significant dilution to existing stockholders. A copy of this August 18, 2022 letter is attached as **Exhibit F**.

66.     This letter, which was sent by the Company **after** the CB Round fundraising effort had closed, shared for the first time the material information that the Company was expanding into the field of radiation illness. *See* **Ex. F**.

13

67.     Specifically, the letter stated:

Acute radiation sickness (ARS) is a (thankfully) rare but (unfortunately) important condition that is inadequately treated. We studied scp776 in a blinded rodent model of lethal dose radiation and learned that scp776 reduced mortality by 2.5–fold. Under scp776 treatment, we also observed meaningful improvements in overall health and resistance to internal organ damage.

The data generated from this study has helped move Silver Creek towards significant interactions with major government funding and research agencies. Our most recent engagements are with the medical counter measure (MCM) group for chemical warfare. We intend to apply for funding to conduct studies of scp776 in their models. Beyond the US, Professor Hugh Montgomery (our newest Board member), in conjunction with deeply connected government and military resources, is leading engagement with relevant UK and European counterparts.

*See* **Ex. F** (August 2022 Shareholder Update).

68.     The expansion of Silver Creek's intellectual property into the field of radiation illness undoubtedly will have a major impact on the valuation of Silver Creek stock.

69.     The Company's late disclosure of its decision to expand into the field of radiation illness also brings into relief the Defendants' failure to hire a new CEO for over two years. It is likely that an experienced chief executive officer, knowledgeable in proper corporate governance, would have ensured that all stockholders and potential investors obtained all material information regarding the Company prior to the closing of the CB Round.

70.     The disclosure of these previously omitted details regarding the decision to expand into the radiation illness market caused Ms. Wright to promptly follow up with the Defendants concerning the substantial lack of information and timely communication concerning the Company, its activities and direction - particularly glaring given the lack of a CEO.

14

71.     On September 26, 2022, Ms. Wright, Ms. Throsby and two Silver Creek investors, Rich Edlin and Tim LaLonde, had a conference call to discuss the disclosures made in the Company's August 2022 Shareholder Update.

72.     During this September 26, 2022 call, Ms. Wright sought additional information from Mr. Throsby concerning the valuation of the Company for purposes of the 2022 CB Round. Mr. Throsby told Ms. Wright that "there is no reliable or universally acknowledged method to value shares in a start up biomedical field."

73.     However, on information and belief, both Mr. Throsby and Mr. Taylor were at that time aware of at least one valuation of Silver Creek that had been conducted prior to 2022.

74.     During this September 26, 2022 call, Mr. Throsby stated, at last, that Silver Creek had applied for a large United States Department of Defense grant to investigate the use of Silver Creek's intellectual property to treat radiation illness. As detailed above, such information had only first been mentioned to stockholders in August 2022 – **after** the close of the 2022 fundraising round.

75.     During the September 26, 2022 call, Ms. Wright asked Mr. Throsby when he and the rest of the Board first knew of the potential application for the valuable Department of Defense grant for the treatment of radiation illness, as well as the date on which Silver Creek had applied for the grant. This information was especially significant, given the Board and management failed to make any mention of radiation illness clinical trials or application for a government grant for this purpose in any investor updates prior to the August 2022 Shareholder Update.

76.     Mr. Throsby first hesitated in answering Ms. Wright's questions, and then said he would check his records and report back to her on when the Board and management first learned

of the potential application of Silver Creek intellectual property to radiation illness and when they had applied for the Department of Defense grant.

77.     In a letter dated March 27, 2023, the Board provided Ms. Wright with the following rationale as to why the Company's expansion into radiation illness was not disclosed to potential investors prior to or during the CB Round fundraising effort:

> **Efforts around assessing scp776 in the treatment of radiation illness, and disclosure in the CB fundraising** –
>
> The goal of a radiation study was to make a very small expenditure in a limited preclinical trial to support a possible initial engagement with a variety of research and government agencies. There was never any market sizing work contemplated, executed or documented. The path was not seen as one of commercial exploitation, rather a chance to explore the therapeutic potential of scp776 and – through potential partnership with a government agency – to achieve a meaningful validation for our technology, part of the overall strategy of gaining momentum in the perception of the platform. We began to engage informally with government funding and research agencies with a goal of exploring whether there were projects, partnerships or grants that might emerge as a way to help take forward some limited element of the future development of scp776 and its formulations and applications. Feedback from these conversations was not productive with radiation illness but led to engagement with the chemical warfare group and a formal application that was submitted in August 2022 and approved in November (all after the capital round). As part of the NIH NIAID partnership, this study will be funded by the chemical countermeasures group and performed at no cost to the Company. We will supply the drug and will own the IP output. Given the above, the assessment made by the Company and the Board was that the scale of the initial radiation illness effort (at less than 1 % of the investment we are making in stroke) and the likelihood of a significant outcome were both so small and so remote as to not be material in the context of disclosures for the CB fund raise. …

A copy of the Board's March 27, 2023 letter is attached hereto as **Exhibit G**.

78.     Upon information and belief, the Company's March 27, 2023 letter to Ms. Wright contains multiple misleading and inaccurate statements regarding the status and scale and the

Company's prioritization of Silver Creek's expansion into the radiation illness market prior to and during the CB Round fundraising effort. As noted above, the Company had conducted preclinical trials and thus knew that Silver Creek's IP had shown extremely promising results in reducing the mortality caused by radiation illness.

79.     Defendants published statements to Ms. Wright purporting to adequately inform her of the CB Round offering when they had knowledge of facts showing that those statements were inaccurate and misleadingly incomplete.

80.     Defendants' failure to disclose all material information to Ms. Wright in connection with the CB Round was intentional, and done with a conscious intent to defraud.

81.     Defendants' statements to Ms. Wright purporting to adequately inform her of the CB Round offering disregarded current factual information acquired by the Defendants prior to making those statements.

82.     Defendants' statements to Ms. Wright purporting to adequately inform her of the CB Round offering were made with a high degree of recklessness, and contained highly unreasonable omissions that presented a danger of misleading Ms. Wright that was either known to the Defendants, or was so obvious they must have been aware of it.

83.     As a result of the acts and omissions alleged above, Ms. Wright was denied any meaningful opportunity to participate in the CB Round, and her interest in Silver Creek was improperly diluted.

## COUNT I
### Securities Fraud
### § 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5

### (All Defendants)

84.     Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

85.     Defendants employed devices, schemes, and artifices to defraud, directly and indirectly, caused incomplete - and thereby false - statements to be made to Ms. Wright as specified above, failed to state material facts to Ms. Wright while under a duty to do so, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Ms. Wright in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

86.     As set forth above, Defendants made false material representations to Ms. Wright in connection with Silver Creek's CB Round securities offering, and also omitted to state material facts necessary in order to make the statements that were made to Ms. Wright in connection with the CB Round, in light of the circumstances under which they were made, not misleading.

87.     In particular, and notwithstanding the other material misrepresentations and omissions set forth above, prior to the close of the CB Round, Defendants failed to disclose to Ms. Wright:

      a.   that Silver Creek had previously identified and conducted lengthy and costly research into, or

      b.   that Silver Creek had already conducted preclinical trials and had knowledge that the Silver Creek molecule had shown extremely promising results in reducing the mortality caused by radiation illness.

88.     Defendants, by the use, means or instrumentalities of interstate commerce, including use of the telephones, mails, wires and the Internet, disseminated the misrepresentations and material omissions referenced above.

89.     Defendants knew or must have known that Ms. Wright would rely on the misrepresentations and material omissions described above in connection with the Silver Creek Round CB securities offering.

90.     Defendants acted with the intent to defraud, or in the alternative, their misrepresentations and material omissions were highly unreasonable, involved an extreme departure from the standards of ordinary care, and presented a danger of misleading buyers such as Ms. Wright that was either known to them or so obvious that they must have known of it. The defendants acted with scienter.

91.     The misrepresentations and material omissions described above were related to and connected with Ms. Wright's right to a meaningful and informed opportunity to participate in Silver Creek's Round CB securities offering, and Defendants intended to and did deceive Ms. Wright as alleged above and prevented her from having a full and fair opportunity to purchase Silver Creek securities.

92.     Ms. Wright reasonably relied on the Defendants' misrepresentations and material omissions described above and, as a consequence, did not participate in Silver Creek's Round CB securities offering.

93.     Ms. Wright suffered an economic loss as a result of Defendants misrepresentations and material omissions described above, including but not limited to a dilution of her interests, in an amount to be proven at trial.

94.     Ms. Wright's loss was proximately caused by the Defendants' misrepresentations and material omissions described above.

95.     By engaging in the conduct set forth and described above, Defendants violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5.

## COUNT II
**Control Person Liability**
**§ 20(a) of the Securities and Exchange Act of 1934**

**(Board Defendants)**

96.     Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

97.     At all relevant times, Mr. Throsby was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Throsby was a culpable participant in the above-referenced violations of § 10(b) of the Exchange Act, and is therefore jointly and severally liable for those violations.

98.     At all relevant times, Mr. Agne was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Agne was a culpable participant in the above-referenced violations of § 10(b) of the Exchange Act, and is therefore jointly and severally liable for those violations.

99.     At all relevant times, Mr. Taylor was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Taylor was a culpable participant in the above-referenced violations of § 10(b) of the Exchange Act, and is therefore jointly and severally liable for those violations.

100.    At all relevant times, Mr. Marks was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Marks was a

culpable participant in the above-referenced violations of § 10(b) of the Exchange Act, and is therefore jointly and severally liable for those violations.

101.    At all relevant times, Mr. Murtaugh was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Murtaugh was a culpable participant in the above-referenced violations of § 10(b) of the Exchange Act, and is therefore jointly and severally liable for those violations.

**COUNT III**
**Securities Fraud**
**§ 17(a) of the Securities Act of 1933**

**(All Defendants)**

102.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

103.    By engaging in the conduct described and set forth above, Defendants directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails: a) with scienter, employed devices, schemes, or artifices to defraud; b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon Ms. Wright.

104.    The conduct of the Defendants described and set forth above involved fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to Ms. Wright.

21

105.    By engaging in the conduct described and set forth above, Defendants violated and continue to violate Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)).

**COUNT IV**
**Control Person Liability**
**§ 15 of the Securities Act of 1933**

**(Board Defendants)**

106.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

107.    At all relevant times, Mr. Throsby was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Throsby was a culpable participant in the above-referenced violations of § 17(a) of the Securities Act, and is therefore jointly and severally liable for those violations.

108.    At all relevant times, Mr. Agne was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Agne was a culpable participant in the above-referenced violations of § 17(a) of the Securities Act, and is therefore jointly and severally liable for those violations.

109.    At all relevant times, Mr. Taylor was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Taylor was a culpable participant in the above-referenced violations of § 17(a) of the Securities Act, and is therefore jointly and severally liable for those violations.

110.    At all relevant times, Mr. Marks was a member of the Silver Creek Board of Directors and had control over the Company. Upon information and belief, Mr. Marks was a culpable participant in the above-referenced violations of § 17(a) of the Securities Act, and is therefore jointly and severally liable for those violations.

111.    At all relevant times, Mr. Murtaugh was a member of the Silver Creek Board of

Directors and had control over the Company. Upon information and belief, Mr. Murtaugh was a

culpable participant in the above-referenced violations of § 17(a) of the Securities Act, and is

therefore jointly and severally liable for those violations.

**COUNT V**
**Violation of Blue Sky Laws:**
**California Code, Corporations - CORP § 27101**

**(All Defendants)**

112.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth

herein.

113.    In order to induce Ms. Wright to elect not to invest in the CB Round, the

Defendants caused to be made to Ms. Wright, at the times and in the places set forth above,

several misrepresentations, and failed to state material facts to Ms. Wright while under a duty to

do so, and continuously thereafter failed and refused to correct these misrepresentations.

114.    When the Defendants made these misrepresentations and failed to state material

facts to Ms. Wright, and failed to promptly correct the misrepresentations, they knew or must

have known these statements were false and misleading and that she would rely thereon in order

to decide whether to purchase and acquire Silver Creek securities.

115.    Ms. Wright did in fact rely on these misrepresentations and the failures to state

material facts, and the failure to correct the misrepresentations, as set forth herein, and such

reliance was objectively reasonable. Ms. Wright's reliance on these misrepresentations and the

failures to state material facts and the failure to correct the misrepresentations, was material to

the investment and acquisition decisions made by Ms. Wright.

116.     As a direct and proximate result of the wrongful conduct of the Defendants, specifically their omissions of material fact upon which she relied, Ms. Wright suffered damages in connection with her purchases and acquisitions of Silver Creek securities, including dilution of her interests, in an amount to be proven at trial.

## COUNT VI
## Violation of Massachusetts "Blue Sky" Law: M.G.L. c. 110A

### (All Defendants)

117.     Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

118.     Under Massachusetts law, it is illegal "in connection with the offer, sale, or purchase of any security, directly or indirectly … to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

119.     As described above, despite a clear duty to Plaintiffs in this regard, Defendants violated this law in connection with their conduct with regard to Plaintiffs, causing Plaintiffs damages in an amount to be proven at trial.

## COUNT VII
## Negligent Misrepresentation

### (All Defendants)

120.     Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

121.     In order to induce Ms. Wright not to invest in the CB Round, the Defendants negligently caused to be made to Ms. Wright, at the times and in the places set forth above, several misrepresentations, and failed to state material facts to Ms. Wright while under a duty to

do so, and continuously thereafter negligently failed and refused to promptly correct these misrepresentations.

122.    When the Defendants caused to be made these misrepresentations and failed to state material facts to Ms. Wright, and failed to promptly correct the misrepresentations, they knew or should have known these statements were false and misleading and that she would rely thereon in order to decide whether to purchase and acquire Silver Creek securities.

123.    Ms. Wright did in fact rely on these misrepresentations and the failures to state material facts, and the failure to correct the misrepresentations, as set forth herein, and such reliance was objectively reasonable. Ms. Wright's reliance on these misrepresentations and the failures to state material facts and the failure to correct the misrepresentations, was material to the investment and acquisition decisions made by Ms. Wright.

124.    Defendants' breaches were and are a substantial factor in directly and proximately causing damages to Plaintiffs in an amount to be proven at trial.

## COUNT VIII
### Breach of Contract

### (Silver Creek)

125.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

126.    Ms. Wright and Defendant Silver Creek had an enforceable agreement, the IRA, which contained a "right of first offer", entitling Ms. Wright with the right to a meaningful and informed opportunity to participate in all future securities offerings by Silver Creek, and which required the Company to provide full, fair and complete notice of any and all future investment opportunities in Silver Creek at the time(s) they became available to Ms. Wright.

127.    The primary purposes of the IRA were to provide Ms. Wright with the right to a meaningful and informed opportunity to participate in all future securities offerings by Silver Creek, as well as to provide Ms. Wright protection against subsequent dilution of her holdings in the Company.

128.    Ms. Wright honored the IRA by providing investment funds in furtherance of the agreement.

129.    Without legitimate excuse, Silver Creek breached this agreement by failing to provide proper notice or disclosure to Ms. Wright in connection with the right of first offer in regards to the CB Round.

130.    Ms. Wright has been and continues to be damaged by this breach in an amount to be proven at trial.

## COUNT IX
## Breach of the Covenant of Good Faith and Fair Dealing

### (Silver Creek)

131.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

132.    All agreements carry with them an implied covenant of good faith and fair dealing.

133.    Here, the IRA to which Ms. Wright was a party contained provisions, including a right of first offer, intended to provide Ms. Wright with the right to a meaningful and informed opportunity to participate in all future securities offerings by Silver Creek, as well as to protect her original and significant investment from dilution in subsequent fundraising rounds.

134.    The actions and omissions of the Defendants deprived Ms. Wright of her reasonable expectations in connection with their agreement, directly and proximately causing damages to Plaintiffs, in an amount to be proven at trial.

## COUNT X
### Unfair / Deceptive Business Practices:
### Cal. Bus. & Prof. Code 17200 / M.G.L. c. 93A § 11

### (All Defendants)

135.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

136.    California law expressly prohibits "any unlawful, unfair or fraudulent business act or practice."

137.    Massachusetts law prohibits the use of "unfair or deceptive acts or practices" in trade or commerce.

138.    Defendants' actions and omissions, including the withholding of key details in connection with the 2022 CB Round fundraising effort, thereby breaching both the notice provision(s) and the covenant of good faith and fair dealing in connection with the IRA, to enrich themselves, violated these laws.

139.    At all times relevant to this Complaint, Ms. Wright was acting as an Accredited Investor pursuant to 17 CFR § 230.501(a)(5).

140.    Defendants' actions and omissions relating to the 2022 CB Round fundraising effort occurred primarily and substantially in the Commonwealth of Massachusetts.

141.    Defendants' breaches were and are a substantial factor in directly and proximately causing damages to Plaintiffs, in an amount to be proven at trial.

27

## COUNT XI
## Common Law Fraud

### (All Defendants)

142.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

143.    In order to induce Ms. Wright not to invest in the CB Round, the Defendants made to Ms. Wright, at the times and in the places set forth above, several misrepresentations, and failed to state material facts to Ms. Wright while under a duty to do so, and continuously thereafter failed and refused to correct these misrepresentations.

144.    When the Defendants made these misrepresentations and failed to state material facts to Ms. Wright, and failed to promptly correct the misrepresentations, they knew or should have known these statements were false and misleading and that she would rely thereon in order to decide whether to purchase and acquire Silver Creek securities.

145.    Ms. Wright did in fact rely on these misrepresentations and the failures to state material facts, and the failure to promptly correct the misrepresentations, as set forth herein, and such reliance was objectively reasonable. Ms. Wright's reliance on these misrepresentations and the failures to state material facts and the failure to correct the misrepresentations, was material to the investment and acquisition decisions made by Ms. Wright.

146.    As a direct and proximate result of the wrongful conduct of the Defendants, specifically their omissions of material fact upon which she relied, Ms. Wright suffered damages in connection with her purchases and acquisitions of Silver Creek securities in an amount to be proven at trial.

## COUNT XII
## Breach of Fiduciary Duty

## (Board Defendants)

147.    Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

148.    As Directors of Silver Creek, the Board owed Ms. Wright the utmost fiduciary duties of care and loyalty, which included a duty to make accurate material disclosures to Silver Creek's stockholders.

149.    These duties required the Board to place the interests of Silver Creek stockholders above their personal interests.

150.    The members of the Board breached their fiduciary duties to Ms. Wright by prioritizing their own personal and/or financial interests in relation to the CB Round fundraising effort, which was unfair to Ms. Wright, a Silver Creek shareholder.

151.    They also breached their duty of candor by making false and misleading statements to Ms. Wright prior to, and during, the CB Round.

152.    As a result, Ms. Wright was harmed by being deprived of the information required to determine whether or not to invest in the CB Round prior to its close in June of 2022.

153.    In addition, by virtue of the misstatements and material omissions in the disclosures made to Ms. Wright prior to and during the CB Round, Ms. Wright could not exercise in an informed manner her right to purchase additional capital stock in the Company.

154.    As a result of these breaches of fiduciary duty, Ms. Wright suffered damages in an amount to be determined at trial.

## COUNT XIII
### Unjust Enrichment

### (Board Defendants)

155.   Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

156.   The members of the Board breached their fiduciary duties to Ms. Wright and deprived her of her meaningful opportunity and right to invest in Silver Creek during the CB Round.

157.   Members of the Board thereafter did in fact invest in Silver Creek during the CB Round.

158.   Due to the Board's decision to withhold material information regarding the Company from Ms. Wright, she was not able to meaningfully exercise her right of first refusal and invest in Silver Creek shares during the CB Round.

159.   Whereas members of the Board, through their wrongful conduct described herein, were unjustly enriched by their ability to purchase Silver Creek shares at an improperly low valuation during the CB Round.

160.   All Silver Creek shares purchased by the Board at an improperly low valuation during the CB Round should be disgorged.

## COUNT XIV
### Declaratory Relief

### (Silver Creek)

161.   Ms. Wright reasserts and incorporates the above Paragraphs as if fully set forth herein.

162.    An actual controversy exists between Ms. Wright, on the one hand, and Defendants, on the other hand, as to the rights, duties and obligations of Defendants with respect to Ms. Wright in connection with her status as a Silver Creek shareholder and regarding the CB Round fundraising effort.

163.    A binding declaration of the Court, pursuant to 28 U.S.C. § 2201, determining the rights, duties and obligations of the parties with respect to Ms. Wright in connection with her status as a Silver Creek shareholder and regarding the CB Round fundraising effort is necessary and would resolve the parties' dispute.

164.    The CB Round was not authorized by the affirmative votes of a majority of fully informed, disinterested directors.

165.    The vote(s) approving the CB Round was either based on interested directors participating, or those that were not independent, or both.

166.    The CB Round was not fair to Silver Creek as of the time it was authorized by the Board.

167.    The CB Round is therefore voidable in its entirety and should be voided.

168.    Accordingly, pursuant to 28 U.S.C. §§ 2201 and 2202, Ms. Wright respectfully requests that the Court declare the following:

   a.   The CB Round was not authorized by the affirmative votes of a majority of fully informed, disinterested directors.

   b.   The vote(s) approving the CB Round was either based on interested directors participating, or those that were not independent, or both.

   c.   The CB Round was not fair to Silver Creek as of the time it was authorized by the Board.

    d.   The CB Round is therefore voidable in its entirety.

    e.   All Silver Creek shares purchased by the Board at an improperly low valuation during the CB Round should be disgorged.

    f.   That Ms. Wright was deprived of her meaningful opportunity and right to purchase the Silver Creek capital stock during the CB Round due to the Defendants' decision to withhold material information regarding the Company from the Plaintiff.

## DEMAND FOR RELIEF

Therefore, Ms. Wright demands judgment against the defendants, jointly and severally for the following relief:

1. Damages in an amount to be proved at trial;

2. Treble damages and attorneys' fees;

3. Disgorgement in an amount to be proved at trial;

4. A declaration as set out in Count XIV;

5. Prejudgment interest;

6. Costs; and

7. Such other relief to which she may be entitled at law or in equity.

## JURY DEMAND

Ms. Wright demands a jury on all issues so triable.

Respectfully submitted,

SUZANNE WRIGHT, Individually and as Trustee of THE WENSLEY HEFNI 2011 IRREVOCABLE TRUST,

By her attorneys:

*/s/ Theodore J. Folkman*

John J. McGivney (BBO No. 333510)
Michael A. Burkett (BBO No. 661294)
Theodore J. Folkman (BBO No. 647642)
Rubin and Rudman LLP
53 State Street
Boston, MA 02109
Tel: (617) 330-7000
jmcgivney@rubinrudman.com
mburkett@rubinrudman.com
tfolkman@rubinrudman.com

Dated: July 18, 2023