# SILVER CREEK

Exhibit G

27th March 2023

Dear Suzanne,

We wanted to reach out with some thoughts on a number of the issues that have emerged in the formal legal process, to try and help share with you the fullest understanding possible of each of the topics.

Our hope would be that between the formal materials exchanged, this explanation below on what might be unresolved issues, and hopefully a discussion or exchange with you, your legal representatives (if you so choose), and ourselves (we would be happy to provide whatever selection of board members and executives that you consider appropriate) – that we might find a path forward. To this end, we would also like to explore measures that can be taken to address some of the issues you have raised and to provide you with an ongoing level of transparency and insight into the Company. The goal would be to alleviate your concerns so that you are better able to get comfortable with the idea that the Company and its Board and executives are working hard for you and all other shareholders to deliver the drug and opportunities associated with a successful Phase 2 trial and beyond.

Below is an outline of our thinking and understanding of the main topics that might appear to be outstanding. Of course, if there are others that we may have missed that you would like to better understand, please do not hesitate to bring them to our attention and we will do our best to address them.

1. **Structure of the CB fundraising** – The goal in designing the CB was to replicate substantially the D round structure, but to do so in a way that appropriately reflected the progress the Company had made between the two periods – i.e. both deals have a cap and a floor to the conversion price, in both cases the strike is dependent on the level of future equity capital raises. The main difference between the rounds being that for the CB there is a $12 cap and $6 floor, while for round D there is a $6 cap and no floor or a zero floor. As with the D round, the hope and expectation is that future funding or a transaction based on further proof of concept would provide ever higher valuations, as such most people think of the D round as a $6 round, and correspondingly, the CB as a $12 dollar round. This structure was seen as helping investors get comfortable with uncertainty on valuation in a period before any data is available from the phase 2 efforts. $12 values the Company at approximately $500 million. This is a significantly higher absolute and relative valuation than most listed and unlisted biotechs that are further along their journey.

2. **Valuation of the CB fundraising** – We are afraid there are no further documents responsive to your questions on valuation, beyond the detailed description provided in the February 2022 shareholder information pack. Raising capital is as much driven by a reasonable assessment of what the market will bear (i.e. a practical outcome to the question of, at what price and in what structure will investors contribute new money to the journey) as it is by a more theoretical assessment of valuation – and that was important in our thinking as well.

# SILVER CREEK

3. **Comparison of the D round and the CB round** – We understand in some of the dialogue it has been suggested that there was no difference between the price or valuation implied between the D round and the CB. We believe that the correct way of comparing the two (and the way that the Board reasonably compared the two) is either (i) cap to cap, i.e. $6 for round D v $12 for the CB, representing a minimum doubling of valuation between the rounds, despite a difficult macro environment for biotechs; or (ii) floor to floor i.e. $0 for round D v $6 for the CB. These comparisons highlight the protective nature of the CB. Future dilution is managed very rigorously in the CB in more difficult future capital raising conditions. In summary, the round is either double the value, or if the 'reset floor' is valued, the CB round is more than double the valuation of the D round.

4. **Buyers of the CB round** – We shared with investors that Board member participation in the CB was 21%. This is well below the pro rata of their collective ownership. In this context, a "low valuation" would not have advantaged the Board members, rather it would have the effect of diluting their holdings, harming their economic interests. As is the case with several of our shareholders, these same Board members have been regular suppliers of capital, especially in round C and the milestone warrants, round D and, most recently, in the CB round. There is nothing unusual in the proportion of the raise going to this group and, as mentioned, it is less than in previous rounds of fundraising.

5. **Efforts around assessing scp776 in the treatment of radiation illness, and disclosure in the CB fundraising** – The goal of a radiation study was to make a very small expenditure in a limited preclinical trial to support a possible initial engagement with a variety of research and government agencies. There was never any market sizing work contemplated, executed or documented. The path was not seen as one of commercial exploitation, rather a chance to explore the therapeutic potential of scp776 and – through potential partnership with a government agency – to achieve a meaningful validation for our technology, part of the overall strategy of gaining momentum in the perception of the platform. We began to engage informally with government funding and research agencies with a goal of exploring whether there were projects, partnerships or grants that might emerge as a way to help take forward some limited element of the future development of scp776 and its formulations and applications. Feedback from these conversations was not productive with radiation illness but led to engagement with the chemical warfare group and a formal application that was submitted in August 2022 and approved in November (all after the capital round). As part of the NIH NIAID partnership, this study will be funded by the chemical countermeasures group and performed at no cost to the Company. We will supply the drug and will own the IP output. Given the above, the assessment made by the Company and the Board was that the scale of the initial radiation illness effort (at less than 1% of the investment we are making in stroke) and the likelihood of a significant outcome were both so small and so remote as to not be material in the context of disclosures for the CB fund raise. Board member, Dr Jim Marks, has extensive experience in biological countermeasures for biodefence, having served as an expert for federal government agencies. He would be happy to share with you his perspective on this matter.

6. **Position of the CEO, search for a CEO, and bylaws** – The agreement to separate from Mike Fairbanks as CEO and Chairman was a complicated one, but one where the entire Board felt it had no choice in order to protect the resources and position of the Company and its shareholders. Following his departure, the decision was taken not to rush to replace him as the immediate need for stability and continuity was best met by a strong leadership framework comprising our existing executive team – CSO/CTO Kris Kuchenbecker and CMO Lakhmir "Mink" Chawla – supported by increased engagement by Board members.

# SILVER CREEK

Additional time could and should then be taken to find a suitable CEO. At all times the Board has operated very much in the spirit of the bylaws. In 2022, we actively sought a dedicated CEO; actively assessing a number of candidates and, in the case of one candidate, conducting a multi-month deep dive with Board members and the candidate travelling for whole day meetings, including with the senior executive team. We are working on a new search firm connection and new CEO candidates now. The Board very much shares your desire to see an experienced biotech executive in place and will continue to work hard to achieve that outcome.

7. **Speed of phase 2 delivery** – We share your frustration with the speed of execution of the phase two trial. The post covid environment in hospitals across the country continue to make site enrollment and patient onboarding a difficult and time consuming process. The intelligence we gather from doctors, hospitals, CROs and other biotechs unfortunately confirm that our experience is far from unique. Mink, Brian Byrnes and the wider clinical trials team continue to fight hard to bring online as many productive sites as possible, towards completion of the full phase 2 trial in the most timely way possible. A conversation with Mink on the topic may be of value.

We hope that the above material is helpful towards engendering the fullest understanding possible of the Company and its complexities. To reinforce this, and in order to help bring closure to your concerns, we are happy to discuss additional actions that could be taken to provide you with continued comfort and transparency. If of interest to you, we can explore the possibility of appointing you, or your nominated representative, as a Board Observer, to ensure ongoing insight into the Company and its operations. Furthermore, to address your specific concern around the CB fundraise and valuations, we could potentially reopen the CB for you and/or other shareholders to participate.

Please be assured that it is our collective intent and hope is to deliver the most timely and cost effective program, and most importantly a successful phase 2 trial result – after which, as previously described, we would intend to see institutional level / or large pharma partnership or investment or buy out of the enterprise, and deliver the patient health outcomes and investment returns consistent with the hard work and investments of the last ten years.

Thank you for your investment and your consideration and we hope to speak in the near future.

Mark Agne
Jim Marks
Hugh Montgomery
Nick Taylor
Tim Throsby